**CAPITAL TECHNOLOGY INFORMATION SERVICES, INC. and Raj N. Shah, Appellants,**

v.

**ARIAS & ARIAS CONSULTORES and Pegasus Brokerage House, Inc., Appellees.**

No. 05–07–00280–CV.

Court of Appeals of Texas, Dallas.

Nov. 10, 2008.

Rehearing Overruled Dec. 22, 2008.

---

Sam Joyner, Mark W. Bayer, Stacy R. Obenhaus, Gardere, Wynne and Sewell, L.L.P., Dallas, for Appellants.

Monica Lynne Luebker, Figari, Davenport, L.L.P., Dallas, for Appellees.

## OPINION

Opinion by Chief Justice THOMAS.

Arias & Arias Consultores and Pegasus Brokerage House, Inc. sued Capital Technology Information Services, Inc., Raj N. Shah, and others who are not parties to this appeal for unjust enrichment, conversion, conspiracy, and other causes of action. After the trial court denied the special appearances filed by CTIS and Shah, they filed this interlocutory appeal.

CTIS and Shah argue the trial court erred because: (1) Arias and Pegasus failed to plead specific jurisdictional facts; (2) CTIS and Shah met their burden to negate the jurisdictional facts pleaded; (3) Arias and Pegasus failed to offer sufficient evidence supporting their allegations of alter ego; (4) Arias and Pegasus failed to plead and prove that jurisdiction in Texas was consistent with fair play and substantial justice; (5) the evidence was legally insufficient to support any presumed findings that support specific or general jurisdiction over CTIS and Shah; and (6) the trial court abused its discretion when it sustained Arias and Pegasus's objections to CTIS and Shah's special appearance evidence. We conclude the trial court did not err when it denied Shah's and CTIS's special appearances.

## Background

Capital Surini Group International, Inc., a Maryland corporation, is a service information technology and software development corporation with its principal place of business in Rockville, Maryland. CSGI–Maryland has no employees, and its business is conducted by CTIS. CSGI–Maryland, however, does not pay the salaries of CTIS's employees. CTIS is a Maryland corporation and a wholly-owned subsidiary of CSGI–Maryland, with its principal place of business in Rockville, Maryland. CTIS provides information technology products and services that help clinical trial sponsors improve the safety and efficacy of their clinical trials. CSGI–Maryland and CTIS have common officers and directors. Shah, a Virginia resident, is the chief executive officer and chairman of both CSGI–Maryland and CTIS. In 2000, Shah owned approximately 65% of the shares in CSGI–Maryland. CSGI–Maryland's financial statements are reported on a consolidated basis with its subsidiaries, including CTIS,

and CSGI–Maryland files a consolidated federal income tax return. However, CTIS files a separate Maryland state income tax return. CSGI–Maryland and CTIS share the same office space, CTIS pays the rent for both entities, and the office space is leased from Shah.

CSGI–Maryland planned to take itself "public" through a reverse merger and private placement. The plan provided for CSGI–Maryland to merge with Silver River Ventures, Inc., a Nevada corporation, with Silver River being the surviving corporation. Following the merger, Silver River would change its name to Capital Surini Group International, Inc., a Nevada corporation. CSGI–Nevada's stock would be sold in a private placement to capitalize a new line of business called C3Care.

In order to locate investors, Shah contacted George Malina, a financial consultant and Texas resident, who had previously raised funds for CSGI–Maryland. G. Malina and Shah reached a preliminary agreement with Salomon Grey Financial Corporation, a stock brokerage firm located in Dallas, Texas, to undertake the private placement. Shah had more than ten telephone conversations with Salomon Grey when negotiating its role in the private placement. On April 11, 2000, Shah signed a letter of intent that Salomon Grey would act as the placement agent for the private offering and to secure a bridge loan.

G. Malina asked his attorney, Jim Choate of Rockwall, Texas, to represent him and help him understand the proposed transaction. Shah traveled to Texas to meet with G. Malina and Choate regarding the private placement. They agreed that Choate would act as escrow agent for the private placement. G. Malina and Choate then met with Salomon Grey, in Dallas, for a "working session" regarding how to proceed with the private placement. Choate

insisted the escrow relationship be governed by Texas law. In coordinating the drafting of the private placement memorandum (PPM) and the solicitation of the sale of stock, Shah and CTIS personnel made over seventy telephone calls to Choate in Texas and over three hundred telephone calls to G. Malina in Texas, and transmitted over forty facsimiles to both Choate and G. Malina in Texas.

In May 2000, the PPM was finalized. Pursuant to the terms of the PPM, CSGI–Nevada offered to sell a minimum of 1,333,333 shares and a maximum of two million shares of common stock at $4.50 per share. In the PPM, Shah is referred to as the CEO and chairman of CSGI–Nevada and CSGI–Nevada is referred to as "an established Information Technology (IT) company that offers a wide range of advanced IT services and applications to government and commercial clients in the healthcare industry through its subsidiary [CTIS]." Under the terms of the PPM, an escrow agreement provided that the funds paid by an investor at the time of subscription would be received by American National Bank of Texas located in Rockwall, Texas.

Copies of the PPM were provided to G. Malina and Shah to use in soliciting sales. G. Malina solicited Dallas investors and was required to inform Shah of the potential investors he was soliciting. G. Malina brought Raymond Molina, a Panamanian investment consultant, and Craig Medoff into the transaction to assist in soliciting investors.

In addition to his trips to Dallas to meet initially with G. Malina and Choate, Shah traveled to Texas twice to solicit investments in the PPM transaction. He first went to Dallas to meet with William McKenzie, a member of the board of directors for Scottish Rite Hospital, to solicit investment. On another occasion, Shah

traveled to Texas to meet with former Lieutenant Governor Ben Barnes in an effort to find other institutional investors.

As a result of R. Molina's marketing efforts, Choate accepted $330,000 from Panamanian investors Arias and Pegasus as payment for their subscriptions for shares. As a result of G. Malina's marketing efforts, Choate accepted $449,970 and $9,978 from Swiss investors, Giannina Biousse–Valdes and Geneva Asset Management, S.A., as payment for their subscriptions for shares. The money from the Swiss investors was initially placed into a Swiss escrow account, then transferred to the Texas escrow account.

On July 28, 2000, after the Panamanian and Swiss sales, at a regular meeting of the board of directors for CSGI–Maryland, the board of directors terminated: (1) the PPM offered by CSGI–Nevada effective July 30, 2000 because they had not obtained the minimum subscription of $6 million; and (2) CSGI–Maryland's merger negotiations with Silver River.

On September 20, 2000, Choate sent letters from Texas to Biousse–Valdes, vice president of Compagnie Bancaire Geneve, and to the Panamanian investors through R. Molina. The letters referenced the PPM and advised that the Swiss and Panamanian investors' subscriptions at the original price of $4.50 per share had been filled. The letters also advised that more stock was available at the price of $4.50 per share. The letter did not advise the investors that the board of directors for CSGI–Maryland had terminated the PPM and merger negotiations with Silver River. The Swiss and Panamanian investors purchased additional stock at $4.50 per share, and the funds for these additional stock purchases were deposited into the Texas escrow account. On October 18, 2000, Shah signed common stock subscription agreements issuing stock in CSGI–Mary-

land to Choate and Compagnie Bancaire Geneve Banking Corporation Geneva. According to Choate, the common stock subscription agreements issuing shares to Choate were made on behalf of the Panamanian investors. The subscription agreements for Compagnie Bancaire Geneve were delivered from CSGI–Maryland to Choate in Texas. Choate then forwarded them to the Swiss investors.

Shah instructed Choate to transfer $350,000 from the Texas escrow account into Shah's personal bank account in Virginia. These funds were transferred in four transactions. In October 2000, Choate sent Shah a cashier's check for $100,000, but Choate stated during his deposition he could not remember whether the funds for the cashier's check came from the escrow account, G. Malina, or R. Molina. On February 9, 2001, Choate wired an additional $100,000 from the escrow account into Shah's personal bank account in Virginia. Then, on February 12, 2001, Choate wired separate sums of $50,000 and $100,000 from the escrow account to Shah's personal bank account.

When G. Malina was in Washington, D.C., Shah complained he needed more money and asked G. Malina to help him. G. Malina agreed to lend Shah $250,000 pursuant to a promissory note dated February 2, 2001 ($250,000 Choate note). The promissory note is payable to the order of Choate, recites the place of payment is Rockwall County, Texas, and states it is governed by the laws of Texas. Shah signed the $250,000 Choate note as chairman and CEO of CSGI–Maryland, as well as in his individual capacity. Geoffrey Grosvenor signed the $250,000 Choate note acknowledging it as corporate secretary for CSGI–Maryland. In exchange for the $250,000 Choate note, but without the approval of the board of directors, Shah issued G. Malina one million shares of

CSGI–Maryland stock in Choate's name. G. Malina insisted that Shah personally guarantee the $250,000 Choate note because G. Malina wanted to be sure he was repaid and believed Shah had personal assets in an amount greater than the assets of CSGI–Maryland.

The loan was funded when G. Malina transferred $250,000 to the Texas escrow account. Choate then transferred the $250,000 from the escrow account to Shah's personal account in Virginia. Shah claims he transferred the $250,000 to CTIS. CTIS made monthly payments on the $250,000 Choate note by transferring funds from the CTIS operating account to the Texas escrow account. CTIS's financial consultant stated CTIS made the payments on the loan because the $250,000 Choate note benefited CTIS.

After the CSGI–Maryland stock was issued to the Swiss investors and Choate on behalf of the Panamanian investors, the investors began questioning the transactions, including why CSGI had not "gone public" and why Choate never transferred to the Panamanian investors the shares he was holding on their behalf. When the investors' questions were not answered, Arias and Pegasus sued CSGI–Maryland, CTIS, Shah, and Choate for unjust enrichment, conversion, and conspiracy, CSGI–Maryland for negligent misrepresentation and negligence, Shah for fraud and violations of the Texas Securities Act, and Choate for breach of fiduciary duty and breach of contract. CSGI–Maryland answered the lawsuit and raised no objection to Texas jurisdiction. CTIS and Shah filed special appearances.

Arias and Pegasus alleged the trial court had specific jurisdiction over Shah. In the alternative, they alleged: (1) the trial court's general jurisdiction over CSGI–Maryland should be imputed to Shah based on the theory of alter ego or single business enterprise; or (2) the trial court's general or specific jurisdiction over CTIS should be imputed to Shah based on the theory of alter ego or single business enterprise. Arias and Pegasus also alleged the trial court had general and specific jurisdiction over CTIS. They alleged two alternative theories: (1) the trial court's general jurisdiction over CSGI–Maryland should be imputed to CTIS based on the theory of alter ego or single business enterprise; or (2) the trial court's specific jurisdiction over Shah should be imputed to CTIS based on the theory of alter ego or single business enterprise. The trial court denied the special appearances. The trial court did not issue findings of fact or conclusions of law.

## Objections to Special Appearance Evidence

In issue six, Shah and CTIS argue the trial court abused its discretion when it sustained some of Arias and Pegasus's objections to their special appearance evidence. Texas Rule of Appellate Procedure 38.1(h) requires the appellant's brief to contain a clear and concise argument for the contentions made, with appropriate citation to authorities and to the record. Tex.R.App. P. 38.1(h). Because issue six is not supported by argument or authorities, we conclude Shah and CTIS waived this issue. We overrule issue six.

## Personal Jurisdiction

■ Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790–91 (Tex.2005); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002); *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex.2002); *Hoffmann v. Dandurand*, 180 S.W.3d 340, 345 (Tex.App.-Dal-

las 2005, no pet.). Because the trial court's exercise of personal jurisdiction over a nonresident defendant is one of law, an appellate court reviews the trial court's determination of a special appearance de novo. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007); *BMC Software,* 83 S.W.3d at 794. However, the trial court must frequently resolve fact questions before deciding the jurisdictional question. *BMC Software,* 83 S.W.3d at 794; *Hoffmann,* 180 S.W.3d at 345.

■ If a trial court enters an order granting or denying a special appearance but does not issue findings of fact and conclusions of law, all facts supported by the evidence that are necessary to support the judgment are implied. *See Moki Mac,* 221 S.W.3d at 574; *BMC Software,* 83 S.W.3d at 795; *Am. Type,* 83 S.W.3d at 806. When the appellate record includes the reporter's and clerk's records, the trial court's implied findings are not conclusive and may be challenged for legal and factual sufficiency on appeal. *BMC Software,* 83 S.W.3d at 795.

■ The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Moki Mac,* 221 S.W.3d at 574; *BMC Software,* 83 S.W.3d at 793; *Am. Type,* 83 S.W.3d at 807. The nonresident defendant has the burden of negating all bases of jurisdiction alleged in the plaintiff's petition. *Moki Mac,* 221 S.W.3d at 574; *BMC Software,* 83 S.W.3d at 793; *Am. Type,* 83 S.W.3d at 807. An exception arises when the plaintiff asserts personal jurisdiction exists under an alter ego theory. *BMC Software,* 83 S.W.3d at 798–99; *see Wolf v. Summers–Wood, L.P.,* 214 S.W.3d 783, 787 (Tex.App.-Dallas 2007, no pet.). A court cannot find personal jurisdiction based on a theory of alter ego unless the plaintiff proves the allegation of alter ego. *See*

*BMC Software,* 83 S.W.3d at 798; *Wolf,* 214 S.W.3d at 787–88.

■ The Texas long-arm statute permits Texas courts to exercise jurisdiction over nonresident defendants that do business in Texas. *See* TEX. CIV. PRAC. & REM. CODE §§ 17.041–.045 (Vernon 2008); *PHC–Minden, L.P. v. Kimberly–Clark Corp.,* 235 S.W.3d 163, 166 (Tex.2007); *BMC Software,* 83 S.W.3d at 795. The broad language of section 17.042 extends Texas courts' personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *PHC–Minden,* 235 S.W.3d at 166.

The Due Process Clause of the Fourteenth Amendment operates to limit the power of a state to assert personal jurisdiction over a nonresident defendant. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County,* 480 U.S. 102, 108, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 294, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Under the Due Process Clause, personal jurisdiction over a nonresident defendant is constitutional when the nonresident defendant has established minimum contacts with the forum state and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174.

General jurisdiction may exist over a nonresident defendant in a lawsuit where the cause of action does not arise out of or relate to the nonresident defendant's contacts with the forum state. *See Helicopteros*, 466 U.S. at 414 n. 9, 104 S.Ct. 1868; *PHC–Minden*, 235 S.W.3d at 168. General jurisdiction is present when the nonresident defendant's contacts in a forum state are continuous and systematic. *Helicopteros*, 466 U.S. at 416–17, 104 S.Ct. 1868; *PHC–Minden*, 235 S.W.3d at 167–69. General jurisdiction over a parent corporation does not automatically establish general jurisdiction over a wholly-owned subsidiary. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *PHC–Minden*, 235 S.W.3d at 172; *see also Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir.1983). "[General,] [p]ersonal jurisdiction may exist over a nonresident defendant if the relationship between the foreign corporation and its parent corporation that does business in the forum state is one that would allow the court to impute the parent corporation's 'doing business' to the subsidiary." *BMC Software*, 83 S.W.3d at 798 (citing *Hargrave*, 710 F.2d. at 1159). The rationale for exercising jurisdiction is that "the parent corporation exerts such domination and control over its subsidiary 'that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction.'" *Id.* at 798 (quoting *Hargrave*, 710 F.2d. at 1159).

The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation. *PHC–Minden*, 235 S.W.3d at 173; *BMC Software*, 83 S.W.3d at 798. The degree of control the parent exercises must be greater than that normally associated with common ownership and directorship. *PHC–Minden*, 235 S.W.3d at 175; *BMC Software*, 83 S.W.3d at 799. The relevant factors for jurisdictional veil piercing were described in *BMC Software*:

To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary. But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice.

*BMC Software*, 83 S.W.3d at 799 (citations omitted).

All of the relevant facts and circumstances surrounding the operations of the parent and subsidiary must be examined to determine whether two separate and distinct corporate entities exist. *PHC–Minden*, 235 S.W.3d at 173. A subsidiary corporation will not be regarded as the alter ego of its parent corporation merely because of: (1) stock ownership; (2) a duplication of some or all of the directors or officers; or (3) an exercise of the control that stock ownership gives to stockholders. *PHC–Minden*, 235 S.W.3d at 175; *BMC Software*, 83 S.W.3d at 799.

Specific jurisdiction may exist over a nonresident defendant in a lawsuit that arises out of or is related to the nonresident defendant's contacts with the forum state. *Moki Mac*, 221 S.W.3d at 576. When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship between the nonresident defendant, the forum state, and the litigation. *Moki Mac*, 221 S.W.3d at 575–76. For a court to exercise specific jurisdiction over a nonresident defendant, two requirements must be met: (1) the nonresident defendant's contacts with the forum

state must be purposeful; and (2) the cause of action must arise from or relate to those contacts. *See Burger King,* 471 U.S. at 474–75, 105 S.Ct. 2174; *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559; *Moki Mac,* 221 S.W.3d at 579.

Purposeful availment is the touchstone of the jurisdictional due process analysis. *Asahi,* 480 U.S. at 109–10, 107 S.Ct. 1026; *Burger King,* 471 U.S. at 474, 105 S.Ct. 2174. A nonresident defendant's activities must be purposefully directed toward the forum state so that the nonresident defendant could foresee being haled into court there. *See Burger King,* 471 U.S. at 474, 105 S.Ct. 2174; *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559. There are three parts to a purposeful availment inquiry: (1) only the nonresident defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person; (2) the contacts relied on must be purposeful rather than random, fortuitous, or attenuated; and (3) the nonresident defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Burger King,* 471 U.S. at 474–75, 105 S.Ct. 2174; *Moki Mac,* 221 S.W.3d at 575.

In addition to minimum contacts, the exercise of personal jurisdiction over a nonresident defendant must comport with traditional notions of fair play and substantial justice. *See Asahi,* 480 U.S. at 113, 107 S.Ct. 1026; *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174; *BMC Software,* 83 S.W.3d at 795. The following factors are considered when making that determination: (1) the burden on the nonresident defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies. *Asahi,* 480 U.S. at 113, 107 S.Ct. 1026; *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174.

## Shah's Special Appearance

In issue one, Shah argues Arias and Pegasus failed to plead jurisdictional facts supporting specific jurisdiction. Initially, it was Arias and Pegasus's burden to plead sufficient allegations to bring Shah within the provisions of the Texas long-arm statute. *See Moki Mac,* 221 S.W.3d at 574; *BMC Software,* 83 S.W.3d at 793. Arias and Pegasus's pleadings must allege facts that, if true, would make Shah subject to specific jurisdiction in the trial court. *See Paramount Pipe & Supply Co. v. Muhr,* 749 S.W.2d 491, 496 (Tex.1988).

Arias and Pegasus alleged the trial court had specific jurisdiction over Shah because he directed the transfer of funds into Texas, traveled to Texas to solicit investment, delivered subscription agreements to Texas, caused the PPM to be issued to numerous Texas residents, received into his personal bank account over $200,000 from Texas, and entered into a loan that was performed in and subject to the laws of Texas. Arias and Pegasus further alleged Shah's liability arises from and is related to the contacts and activities he and his agents conducted in Texas. We conclude Arias and Pegasus's petition pleaded sufficient allegations to bring Shah within the provisions of the Texas long-arm statute for purposes of specific jurisdiction. We overrule the first issue.

In issues two and five, Shah argues he negated the jurisdictional facts pleaded in support of jurisdiction and there is legally insufficient evidence to support the trial court's implied jurisdictional findings. Because Arias and Pegasus's pleadings were sufficient to bring Shah within the provisions of the Texas long-arm statute, Shah assumed the burden of negating all bases

of jurisdiction asserted. *See Moki Mac,* 221 S.W.3d at 574; *BMC Software,* 83 S.W.3d at 793; *Am. Type,* 83 S.W.3d at 807. If there is sufficient evidence to support the trial court's implied findings supporting the jurisdictional facts alleged by Arias and Pegasus, Shah has failed to negate such facts. A legal sufficiency challenge must fail if there is any evidence of probative force to support the fact finder's findings. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex. 1997). Because Shah challenges only the legal sufficiency of the evidence to support the trial court's implied findings of fact, we focus our review upon the evidence supporting those findings.

■ In their response to Shah's special appearance evidence, Arias and Pegasus relied on exhibits to demonstrate specific jurisdiction was established over Shah and argued these exhibits show Shah knew about the sale, directed it, instructed that it be accomplished through Texas, and financially benefited from the sale. Specifically, the evidence shows Shah solicited Texas resident G. Malina to assist him in raising capital through the private placement; Shah and G. Malina negotiated with Dallas-based Salomon Grey to act as the agent for the private placement; Shah met with G. Malina and Choate, a Texas attorney, in Texas, where they agreed Choate would act as the escrow agent; Shah provided G. Malina with the materials for soliciting the stock; Shah sent emails to G. Malina in Texas asking for advice and providing information to pass on to prospective investors; Shah made numerous telephone calls to G. Malina in Texas; Shah was the project manager for the private placement offering; and Shah executed the $250,000 Choate note in his individual capacity for the $250,000 loan from G. Malina, a Texas resident, through Choate, a Texas attorney. We conclude

this evidence demonstrates Shah's contacts with Texas resulted from his purposeful conduct, not the unilateral activity of Arias and Pegasus or others.

The evidence also demonstrates Shah's contacts with Texas were not random, isolated, or fortuitous. In particular, it shows the private placement was to be conducted through Salomon Grey in Dallas; the sale of stock in Texas was contingent on a letter of intent agreement entered into between Shah and Texas resident G. Malina; numerous people in Texas were provided copies of the PPM; Shah traveled to Texas to meet with G. Malina and Choate regarding the private placement and the escrow agreement; Shah telephoned G. Malina over one hundred times regarding his progress in reselling the stock, Shah traveled to Texas to meet with McKenzie to seek investors; and at Shah's instruction, Choate wired $250,000 into Shah's personal bank account from the Texas escrow account. The record also shows Shah traveled to Texas to meet with former Lieutenant Governor Barnes in an effort to find additional institutional investors.

The evidence further shows Shah sought some benefit, advantage, or profit by availing himself of Texas jurisdiction. The escrow agreement was to be performed in and conducted under the laws of Texas, and the $250,000 Choate note stated it was subject to the jurisdiction, venue, and laws of Texas and was to be performed in Texas. *See Lewis v. Indian Springs Land Corp.,* 175 S.W.3d 906, 918 (Tex.App.-Dallas 2005, no pet.).

We conclude the evidence is legally sufficient to support the trial court's implied findings in support of specific jurisdiction over Shah and Shah failed to negate the jurisdictional facts pleaded by Arias and Pegasus. Issues two and five are decided against Shah.

■ In issue four, Shah argues Arias and Pegasus failed to plead and prove jurisdiction in Texas was consistent with traditional notions of fair play and substantial justice. The record reflects Arias and Pegasus asserted the trial court's "assumption of jurisdiction over [Shah] will not offend traditional notions of fair play and substantial justice." Shah responded by filing his special appearance and, among other things, his affidavit in which he states he will suffer a significant burden if forced to defend a lawsuit in Texas because of the cost and inconvenience of travel to Texas. In their response to Shah's special appearance, Arias and Pegasus argue that, even if Shah's special appearance were granted, as chairman and chief executive officer of CSGI–Maryland, he is likely to travel to Texas to participate in the defense of CSGI–Maryland. They further argue some of the documents relating to the transactions at issue are located in Texas, two central witnesses, Choate and G. Malina, reside in Texas, if the claims against Shah were permitted to be adjudicated in Maryland or Virginia it would cause piecemeal litigation, and the PPM and the $250,000 Choate note specify that Texas law governs the transactions.

We conclude, based on the quality, nature, and extent of his activities in Texas, Shah should expect to be called into the courts of Texas. Nothing in the record indicates litigation in Texas would be excessively burdensome or inconvenient for Shah. Further, as CEO and chairman of CSGI–Maryland, which has answered Arias and Pegasus's lawsuit, it is likely Shah will travel to Texas to participate in CSGI–Maryland's defense. Texas courts have an interest in adjudicating commercial transactions involving the solicitation and sale of securities within Texas. CSGI–Maryland has already answered the lawsuit in Texas and piecemeal litigation of the lawsuit would result in inefficiency. Accordingly,

we conclude the exercise of specific, personal jurisdiction over Shah by a Texas court does not offend traditional notions of fair play and substantial justice. We overrule issue four.

Because we have already concluded the trial court had specific jurisdiction over Shah, we need not decide issue three with respect to Shah. *See* TEX.R.APP. P. 47.1. We conclude the trial court did not err when it denied Shah's special appearance.

**CTIS's Special Appearance**

In issue three, CTIS argues the trial court's general jurisdiction over CSGI–Maryland should not be imputed to CTIS on the basis of alter ego. Arias and Pegasus alleged CTIS is the alter ego of CSGI–Maryland for jurisdictional purposes because: (1) they share their headquarters and office space; (2) their officers and boards of directors are identical; (3) they do not have separate board meetings and no separate minutes are kept; (4) the minutes of the board of directors' meeting state that they will combine the financial records for CSGI–Maryland and CTIS, creating one entity, and CSGI–Maryland will be the virtual organization while CTIS will be the revenue generating body; (5) the CSGI–Maryland website automatically diverts viewers to the CTIS website; (6) CSGI–Maryland has no employees; (7) CSGI–Maryland offers CTIS employees a stock incentive plan; (8) CSGI–Maryland and CTIS file a joint audited financial statement and joint tax returns; (9) there are inter-company borrowings; and (10) there is no clear delineation of expenses between CSGI–Maryland and CTIS.

CTIS argues it is not the alter ego of CSGI–Maryland for jurisdictional purposes because Arias and Pegasus failed to prove CSGI–Maryland exerted such dominion and control over CTIS that they

did not constitute distinct and separate entities. Rather, CTIS claims the record shows CSGI–Maryland and CTIS: (1) maintained their own financial data; (2) maintained their own bank accounts and accounting functions; (3) have no undocumented transfers between them; (4) kept their daily operations separate; and (5) maintained corporate formalities.

Because Arias and Pegasus are seeking to impute, for jurisdictional purposes, the contacts of CSGI–Maryland with the forum state to CTIS by disregarding the corporate entities, they must prove the allegation. *See PHC–Minden,* 235 S.W.3d at 173; *BMC Software,* 83 S.W.3d at 798. In their response to CTIS's special appearance, Arias and Pegasus relied on affidavits, depositions, and other exhibits as proof that CSGI–Maryland is the alter ego of CTIS to overcome the presumption of corporate separateness. CTIS also offered exhibits and affidavits in support of its special appearance.

■ The record shows CTIS is a wholly-owned subsidiary of CSGI–Maryland. The two corporations share a building they refer to as their headquarters. The lease for the headquarters is in the name of CSGI–Maryland. CTIS's operations and office are based in that premises, and CTIS pays the rent to Shah, the lessor and owner of the premises. The boards of directors of CSGI–Maryland and CTIS are the same in terms of their composition and number, and Shah is the CEO and chairman of both corporations. Shah owns 65% of the shares in CSGI–Maryland.

The evidence shows the distinction between CTIS and CSGI–Maryland is unclear even to the employees of CTIS. Shah, Rachel Kidwiler, a project manager for CTIS, and Christopher Stathes, executive vice president of CTIS, stated that CTIS provides the services to, and has the contract with, the National Cancer Institute (NCI) and the National Heart Lung and Blood Institute (NHLBI). However, critical documents, including the CSGI–Maryland consolidated financial statements and audited financial statements, and contract documents in the record, show the contract to provide these services is between CSGI–Maryland and the National Institutes of Health (NIH).

CSGI–Maryland and CTIS prepare and disseminate joint audited financial statements and file joint tax returns. In the independent auditor's report, CSGI–Maryland and CTIS are considered part of an "Affiliate Group" that does not constitute a legal entity, and CTIS is referred to as one of the "Controlled Companies." The website for CSGI–Maryland automatically diverts viewers to the website for CTIS. There is a high volume of transactions between the entities, ranging from day-to-day administrative operations to long-term inter-company borrowings and investments. Also, there were long-term loans between CTIS and CSGI–Maryland. These inter-company borrowings were described as facilitating the development of projects and activities. The sensitive aged accounts payable of both CTIS and CSGI–Maryland were entered onto the books of CSGI–Maryland.

The minutes of the board of directors for CSGI–Maryland for the meeting held on January 5, 2000, state:

> The next item of business to come before the Board is the discussion of the restructuring of CSGI[-Maryland]. CSGI[-Maryland] is organized with CTIS as a government contracting organization, with CSGI[-Maryland] providing support to CTIS through the Corporate and Center groups. Because the organization is structured this way, the company has accrued a large amount of expenses that the government considers unallowable in the recent past. **There-**

fore to avoid this problem in the future, CSGI[-Maryland] and CTIS will combine their financial records, creating one entity. CSGI[-Maryland] will be the virtual organization, and CTIS will be the revenue generating body. (emphasis added). The consolidated schedule of CSGI–Maryland and CTIS shows the compensation of the officers of CSGI–Maryland was treated as an expense through CTIS. Notes of the accountant and auditor show that auditing procedures for both CSGI–Maryland and CTIS are listed under the client name CTIS. Also, as identified in the January 5, 2000 minutes of the board of directors of CSGI–Maryland, the accountant's and auditor's notes reflect it was decided the two companies would "combine their financial records."

Shah stated he viewed CSGI–Maryland and CTIS as "one in [sic] the same" for "functional purposes," that CSGI–Maryland has no employees, and the payroll of CSGI–Maryland and CTIS is the same. Further, a letter on CSGI–Maryland letterhead, dated April 3, 2000 and signed by Shah, states that in connection with the private placement, CSGI–Maryland and CTIS should be considered as "one unit acting in concert as one entity." When asked about CTIS's business operations, G. Malina stated in his deposition:

> I never understood which company did what. It seemed like [Shah] changed hats any time he wanted to. If this was more appropriate for a situation, [Shah] would make this company. If that was more appropriate, [Shah] would change his hat or change the company for that. So—I—I—I can't tell you that I knew that one company at one day did this or consistently did that.

The record reflects the $250,000 Choate note was signed by CSGI–Maryland and Shah, individually. G. Malina transferred the proceeds of the $250,000 Choate note to the Texas escrow account. Choate transferred the $250,000 to Shah's personal account, and Shah transferred the $250,000 to CTIS. CTIS made monthly payments on the $250,000 Choate note by transferring funds from its operating account to the Texas escrow account.

In light of this evidence, we conclude Arias and Pegasus met their burden of proof to demonstrate such a degree of control by CSGI–Maryland over CTIS that they are "fused" for jurisdictional purposes. See PHC–Minden, 235 S.W.3d at 176; BMC Software, 83 S.W.3d at 799. The record reflects CSGI–Maryland controls the internal business operations and affairs of CTIS, and that such control is greater than that normally associated with common ownership and directors. See PHC–Minden, 235 S.W.3d at 176; BMC Software, 83 S.W.3d at 799. The actions of CSGI–Maryland demonstrate control beyond "appropriate parental involvement" such as monitoring the subsidiary's finance and capital budget decisions and articulation of general policies. See PHC–Minden, 235 S.W.3d at 176; BMC Software, 83 S.W.3d at 799.

The following facts in the record demonstrate the two corporations are "fused" for jurisdictional purposes: (1) the CSGI–Maryland board of directors resolved that "CSGI[-Maryland] will be the virtual organization, and CTIS will be the revenue generating body" to avoid any problems with payments of expenses by the government pursuant to the contracts to provide support to hospitals; (2) Shah stated he viewed CSGI–Maryland and CTIS as one and the same for functional purposes; (3) individuals working with Shah on the "private placement" stated he treated the corporations as one entity; (4) CTIS personnel performed CSGI–Maryland's contracts with NIH and its related entities; (5)

Shah, the CEO and chairman of both corporations and shareholder of 65% of the CSGI–Maryland stock, stated in a letter that CSGI–Maryland and CTIS should be considered as "one unit acting in concert as one entity" for purposes of the PPM; and (6) CSGI–Maryland was the maker of the $250,000 Choate note but the note was for the benefit of CTIS, and Shah caused CTIS to make the monthly payments. We overrule issue number three.

■ In reaching this conclusion, we necessarily overrule our prior holding in *Le Meridien Hotels & Resorts v. LaSalle Hotel Operating Partnership, I, L.P.*, 141 S.W.3d 870 (Tex.App.-Dallas 2004, no pet.). In *Le Meridien*, we held a Texas plaintiff must prove the parent corporation controls the day-to-day operations of the subsidiary to establish alter ego for jurisdictional purposes. *Le Meridien*, 141 S.W.3d at 881. While control of day-to-day operations may be a fact that supports a finding of alter ego, the applicable legal analysis is whether the parent controls the internal business operations and affairs of the subsidiary to the extent the two companies become "fused" and cease to be separate for jurisdictional purposes. *See BMC Software*, 83 S.W.3d at 799. Having concluded the degree of control exercised by CSGI–Maryland over CTIS is such that they are "fused" for jurisdictional purposes, we need not address issues one, two, and five.

■ Even where the contacts of the parent are imputed to the subsidiary based on the theory of alter ego, the trial court's exercise of general, personal jurisdiction over the subsidiary must comport with traditional notions of fair play and substantial justice. *See Cappuccitti v. Gulf Indus. Prods., Inc.*, 222 S.W.3d 468, 484, 486–87 (Tex.App.-Houston [1st Dist.] 2007, no pet.). In issue four, CTIS argues Arias and Pegasus failed to plead and prove

jurisdiction in Texas was consistent with traditional notions of fair play and substantial justice. Stathes's affidavit states CTIS will suffer a significant burden if forced to defend this lawsuit in Texas because of the cost and inconvenience of travel to Texas. In their response to CTIS's special appearance, Arias and Pegasus argued that, even if CTIS's special appearance were granted, the documents relating to the transactions at issue are located in Texas, two central witnesses, Choate and G. Malina, reside in Texas, if the claims against CTIS were permitted to be adjudicated in Maryland it would cause piecemeal litigation, and Texas law governs the transactions.

■ We conclude the trial court's imputing the Texas contacts of CSGI–Maryland to CTIS does not offend traditional notions of fair play and substantial justice. Nothing in the record indicates litigation in Texas would be excessively burdensome or inconvenient for CTIS. Texas courts have an interest in adjudicating commercial transactions involving the solicitation and sale of securities within Texas. Further, the interstate judicial system's interest in obtaining the most efficient resolution of the controversy will be served by litigation in Texas where most of the individuals and documents are located. CSGI–Maryland has already answered the lawsuit in Texas, and piecemeal litigation would result in inefficiency. Finally, we have not been shown the shared interest of the other states in furthering fundamental substantive social policies cannot be implemented by Texas courts as effectively as the courts of Maryland. Accordingly, we conclude the exercise of general jurisdiction over CTIS by a Texas court, by imputing the trial court's general jurisdiction over CSGI–Maryland to CTIS based on the theory of alter ego, does not offend

traditional notions of fair play and substantial justice. We overrule issue four.

We conclude the trial court has specific jurisdiction over Shah and did not err when it denied Shah's special appearance. Furthermore, the trial court did not err when it denied CTIS's special appearance, determining that for jurisdictional purposes, CSGI–Maryland's contacts with the forum should be imputed to CTIS based on the theory of alter ego.

We affirm the trial court's order denying Shah's and CTIS's special appearances.