Evelyn V. Keyes, Justice,
dissent from denial of rehearing
On rehearing, I disagree with the majority’s holding reversing the trial court’s denial of TMX-Holdings’ special appearance. In my view, the majority misconstrues controlling law, established by the Texas Supreme Court in PHC-Minden, L.P. v. Kimberly-Clark Corp., 235 S.W.3d 163 (Tex. 2007), and it misapplies the PHC-Minden factors used to determine personal jurisdiction over a corporation on an alter-ego theory. The majority therefore dismisses the financial center of a single fused corporate entity from this suit for misappropriation of trade secrets and tor-tious interference with contract. It thus countenances misuse of the corporate form to insulate a corporation from potential damages in tort. Therefore, I respectfully dissent.
The parties in this case are competitors in the automobile title loan market. Well-shire Financial Services, LLC, Meadow-wood Financial Services, LLC, and Integrity Texas Funding, LP (collectively, “Wellshire”) sued TMX Finance Holdings, Inc. (“TMX-Holdings”) and TMX-Finance, LLC (“TMX-Finance”), as well as other “TMX entities” not parties to this appeal, for misappropriation of trade secrets and tortious interference with existing contracts and prospective business relations. Wellshire alleged that the TMX entities collected the license plate numbers of the customers in Wellshire’s parking lot and used that information to contact and solicit those customers.
TMX-Holdings filed a special appearance, which the trial court denied. The court found that TMX-Holdings was the alter ego of its subsidiary, TMX-Finance, which has consented to personal jurisdiction in Texas, and that the Texas courts’ exercise of jurisdiction over TMX-Finance comports with constitutional requirements of fair play and substantial justice. TMX-Holdings filed this interlocutory appeal.
The panel reversed and dismissed TMX-Holdings from the suit. It concluded that Wellshire did not establish that TMX-Holdings exerts such an “abnormal” or “atypical” degree of control over TMX-Finance’s internal policies and practices that the two entities can be fused for jurisdictional purposes. See TMX Fin. Holdings, Inc. v. Wellshire Fin. Servs., LLC, 515 S.W.3d 1, 12, No. 01-16-00044-CV, 2016 WL 5920776, at *8 (Tex. App.Houston [1st Dist.] Oct. 11, 2016, no pet. h.). Wellshire moved for rehearing and en banc reconsideration of the panel opinion.
As Wellshire points out, the evidence establishes that Tracy Young, the President and CEO of both TMX-Holdings and TMX-Finance, owns 100% of the shares of TMX-Holdings; he exerts virtually total control over the operations of both entities; the entities share common ownership, directorship, and headquarters; and the entities do not observe corporate formalities. In other words, the evidence shows that all of the PHC-Minden factors for the exercise of personal jurisdiction over TMX-Holdings are satisfied.
*14 I would hold that the trial court correctly determined that TMX-Holdings is an alter ego of TMX-Finance. I would also hold that the Texas courts’ exercise of jurisdiction over TMX-Finance comports with constitutional requirements of fair play and substantial justice. Therefore, I would grant rehearing and affirm the trial court’s order denying TMX-Holdings’ special appearance.
Personal Jurisdiction
A. Standard of Review
Whether a court can exercise personal jurisdiction over a nonresident defendant is a question of law, and we therefore review de novo a trial court’s determination of a special appearance. Kelly v. Gen. Interior Constr., Inc., 301 S.W.3d 653, 657 (Tex. 2010) (citing Mold Mac River Expeditions v. Drugg, 221 S.W.3d 569, 574 (Tex. 2007)). “When [as here] a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied.” Id. (quoting BMC Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 795 (Tex. 2002)). When the appellate record includes both the reporter’s record and the clerk’s record, the trial court’s implied findings are not conclusive and may be challenged on appeal for legal and factual sufficiency. BMC Software, 83 S.W.3d at 795.
B. Alter Ego Theory of Jurisdiction over a Corporate Entity

1. Controlling Law

Texas law presumes that two separate corporations are distinct entities. PHC-Minden, 235 S.W.3d at 173. However, Texas courts may exercise personal jurisdiction over a nonresident parent corporation if the parent’s relationship with its subsidiary that does business in Texas is one that would allow the court to impute the subsidiary’s “doing business” in Texas to the parent. Cappuccitti v. Gulf Indus. Prods., Inc., 222 S.W.3d 468, 482 (Tex. App.-Houston [1st Dist.] 2007, no pet.). Thus, the party “seeking to ascribe one corporation’s actions to another” must prove that “the parent corporation exerts such domination and control over its subsidiary that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction.” PHC-Minden, 235 S.W.3d at 173 (quoting BMC Software, 83 S.W.3d at 798); Conner v. ContiCarriers & Terminals, Inc., 944 S.W.2d 405, 418 (Tex. App.-Houston [14th Dist.] 1997, no writ) (stating that burden is on plaintiffs to prove existence of alter-ego relationship).
The Texas Supreme Court has outlined the factors relevant for “jurisdictional veil-piercing” on a “single business enterprise” theory:
To “fuse” the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary. But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice.
PHC-Minden, 235 S.W.3d at 175 (quoting BMC Software, 83 S.W.3d at 799); see also El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero S.A. de C.V., 82 S.W.3d 622, 634 (Tex. App.-Corpus Christi 2002, pet. dism’d w.o.j.) (noting that jurisdictional veil-piercing involves different analysis from that used when “determining whether separate corporate entities should be treated as one for liability purposes”). Courts will not regard a subsidiary corpo *15 ration as the alter ego of its parent “merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders.” PHC-Minden, 235 S.W.3d at 175 (quoting Gentry v. Credit Plan Carp, of Houston, 528 S.W.2d 571, 573 (Tex. 1975)) (emphasis added). Rather, courts should consider all of the relevant facts and circumstances surrounding the operations of the parent and subsidiary to determine whether two separate and distinct corporate entities exist. Id. at 173 (quoting Hargrave v. Fibreboard Corp., 710 F.2d 1154, 1160 (5th Cir. 1983)); Capital Tech. Info. Servs., Inc. v. Arias & Arias Consultores, 270 S.W.3d 741, 749 (Tex. App.-Dallas 2008, pet. denied).
“Appropriate parental involvement includes monitoring the subsidiary’s performance, supervision of the subsidiary’s finance and capital budget decisions, and articulation of general policies.” PHC-Minden, 235 S.W.3d at 176. Thus, in making an alter-ego finding, courts require a “ ‘plus’ factor, ‘something beyond the subsidiary’s mere presence within the bosom of the corporate family.’” Id. (quoting Dickson Marine Inc. v. Panalpina, Inc., 179 F.3d 331, 338 (5th Cir. 1999)). Specifically, “to ‘fuse’ two corporations for jurisdictional purposes, a parent must ‘control ] the internal business operations and affairs of the subsidiary* to an extent beyond its role as an investor.” Spir Star AG v. Kimich, 310 S.W.3d 868, 873-74 (Tex. 2010) (quoting PHC-Minden, 235 S.W.3d at 175). Thus, under PHC-Minden, to determine whether a parent corporation and a subsidiary are “fused” on an alter-ego theory so that the courts of the forum state have jurisdiction over both because one of them does business there, courts should take into account “the amount of the subsidiary’s stock owned by the parent corporation, the existence of separate headquarters, the observance of corporate formalities, and the degree of the parent’s control over the general policy and administration of the subsidiary.” 235 S.W.3d at 175. “The degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship.” Cappuccitti, 222 S.W.3d at 482.

2. Facts Relevant to Alter Ego Jurisdiction

TMX-Holdings is a non-resident Delaware corporation with its principal place of business in Georgia. In its original petition, Wellshire alleged that the trial court “has jurisdiction over defendants, nonresident corporations, because [the TMX entities] have purposefully availed themselves of the privileges and benefits of conducting business in Texas.” Wellshire alleged that the named TMX entities were jointly and severally hable for its claims. Wellshire also alleged the following relating to the corporate structure of the TMX entities:
22. Defendants are part of a family of related companies operating under the name “TitleMax.” TitleMax is engaged in the business of automobile title lending, and is a competitor of Plaintiffs.
23. Defendant TMX Texas [TitleMax of Texas, Inc.] operates as a CSO [credit services organization] under Texas law and is a competitor of Plaintiffs.
24. Defendant TMX Finance Texas also operates as a CSO under Texas law and is a competitor of Plaintiffs,
25. Defendant TMX Finance is a parent company which owns ah ownership and membership interests of various operating subsidiaries, including Defendants TMX Finance Texas and TMX Texas. Defendant TMX Finance manages, directs, and controls *16 all operations of its operating subsidiaries, including Defendants TMX Finance Texas and TMX Texas.
26. Defendant [TMX-Holdings] is a parent company which owns all ownership and membership interests in Defendant TMX Finance, and thus indirectly owns Defendants TMX Finance Texas and TMX Texas.
Wellshire’s live pleading, its second amended petition, contained identical jurisdictional allegations.
After the parties conducted jurisdictional discovery, TMX-Holdings filed a special appearance. As evidence supporting its special appearance, TMX-Holdings attached the affidavit of its vice president, Christopher Kelly Wall. Wall averred that TMX-Holdings “was formed in October 2012 in order to facilitate more efficient estate planning and tax reporting for its owners.” He averred that TMX-Holdings does not have any employees, does not issue paychecks, does not file income taxes, does not have any operations, and is not registered to do business in any state. Wall also averred, specifically with respect to Texas, that TMX-Holdings has never been incorporated in Texas, maintained an office or facility in this state, had any employees in Texas, maintained a mailing address or telephone number in Texas, designated a registered agent for service of process in Texas, paid franchise taxes in Texas, maintained a bank account in Texas, owned or leased any kind of property in Texas, been involved in any other litigation in Texas, committed a tort or an illegal act in Texas, been licensed or authorized to do business in Texas, provided services in Texas, advertised or marketed in Texas, or entered into a contract with Texas residents aside from retaining counsel in this proceeding.
With regard to the specific allegations in Wellshire’s lawsuit, Wall averred that “TMX Holdings has never accessed any driving records of anyone, including but not limited to residents of Texas;” He also averred, in support of TMX-Holdings’ contention that it was not the alter ego of any of the other defendants:
TMX Holdings is a separate and distinct entity from the other [TMX entities]. It observes corporate formalities; maintains separate corporate accounts and a separate bank account; does not commingle assets; does not share business departments; has its own financial statements; and has separate operations. Further, it does not exercise sole authority over the other [TMX entities’] general policies and daily operations and does not pay their salaries and expenses. Moreover, TMX Holdings does not have a direct ownership interest in Defendant, TitleMax of Texas, Inc.
However, the irrebuttable documentary evidence produced by Wellshire refutes these claims.

3. Application of PHC-Minden Factors to Wellshire’s Evidence

In response to TMX-Holdings’ special appearance, Wellshire argued that TMX-Holdings was subject to personal jurisdiction in Texas because it was the alter ego of TMX-Finance, which had already consented to jurisdiction. To support its claims, Wellshire produced evidence on each of the PHC-Minden factors.

a. Amount of subsidiary’s stock owned by parent

Wellshire argued that TMX-Holdings “has complete ownership and control over TMX Finance,” as it owns all of the membership interests in TMX-Finance and the same individual, Tracy Young, is the CEO and President of both entities and thus controls both entities. It produced interrogatory answers from TMX-Holdings indicating that Young owns all of TMX- *17 Holdings’ voting shares. Wellshire also attached as evidence a copy of TMX-Finance’s 2012 10-K filing with the Securities and Exchange Commission, which noted that, on September 30, 2012, Young, the sole member of TMX-Finance, transferred 100% of his membership interest to TMX-Holdings. This evidence establishes that TMX-Holdings does own all of TMX-Finance.

b. Degree of parent’s control over general policy and administration of subsidiary

TMX-Finance’s 2012 10-K filing with the Securities and Exchange Commission also stated:
Tracy Young is our founder, Chairman of the Board, Chief Executive Officer, President and the sole beneficial owner of our parent holding company, [TMX-Holdings]. As a result, subject to the limitations in the agreements governing our indebtedness, including the indenture governing our senior secured notes, or the “Indenture,” Mr. Young has the ability to control substantially all matters of significance to the Company [TMX-Finance], including the strategic direction of our business, the election and removal of the managers of [TMX-Finance], the appointment and removal of our officers, the approval or rejection of a sale, merger, consolidation or other business combination, the issuances of additional equity or debt securities, amendments of our organizational documents, the entering into of related party transactions and the dissolution and liquidation of [TMX-Finance], regardless of whether the holders of the senior secured noted, or our “bondholders,” believe that any such action is in their best interests.
As a result of Mr. Young’s complete beneficial ownership and control of [TMX-Finance], his interests could conflict with the interests of our bondholders. For example, if we encounter financial difficulties or are unable to pay our debts as they mature, Mr. Young’s interests as the sole equity owner of our Parent [TMX-Holdings] might conflict with the interests of our bondholders. Mr. Young might also have an interest in pursuing transactions that, in his judgment, could enhance his equity investment, even though such transactions might involve risks to our bondholders. In addition, Mr. Young could cause us to make acquisitions that increase the amount of our indebtedness or sell assets, either of which may impair our ability to make payments under the notes.
This is strong documentary evidence of TMX-Holdings’ control over the general policy and administration of its subsidiary, TMX-Finance. See Cappuccitti, 222 S.W.3d at 484 (considering, when upholding trial court’s alter-ego determination, that “as president of both Minerec and Flottec and the sole owner of Flottec, which owned 90% of Minerec, Cappuccitti exercised complete control over the activities of both Minerec and Flottec”). The majority distinguished Cappuccitti, reasoning that this case was different because Wellshire did not argue that Tracy Young was the alter ego of the TMX entities, whereas the plaintiff in Cappuccitti alleged that each of the three defendants—Cap-puccitti, the parent company Flottec, and the subsidiary company Minerec, which did not contest personal jursidction—were all alter egos of each other. See TMX Fin. Holdings, Inc., — S.W.3d at - n.3, 2016 WL 5920776, at *6 n.3 (citing Cappuccitti, 222 S.W.3d 468). The fact that Wellshire did not name Young as a defendant is immaterial. Young controls both TMX-Holdings and TMX-Finance, just as Cappuccitti controlled both Flottec and *18 Minerec. See Cappuccitti, 222 S.W.3d at 474. I would conclude that Cappuccitti is directly on point and that TMX-Holdings, which is controlled by Young, is an alter ego of TMX-Finance, an entity also controlled by Young. Further, in his deposition, Wall testified that TMX-Holdings was formed at Young’s behest to facilitate his estate planning.
Wellshire also presented evidence that, shortly after Young incorporated TMX-Holdings, TMX-Holdings made a $45 million capital contribution to TMX-Finance, which Wellshire argued was likewise “strong evidence of control,” especially given that TMX-Holdings had “not produced any contract or paperwork demonstrating that the $45 million cash infusion was an arms-length transaction.” Wellshire also presented Wall’s deposition testimony that TMX-Holdings claimed that it currently owes a $120,000 “non-contractual” liability to TMX-Finance. And it presented evidence that TMX-Holdings likewise failed to produce any documentation concerning the $120,000 non-contractual liability to TMX-Finance that it claimed. This evidence is indeed, as Wellshire argued, “strong evidence of control” of TMX-Finance by TMX-Holdings.
c. The observance of corporate formalities
Wellshire also argued that TMX-Holdings failed to follow corporate formalities. It also argued that TMX-Holdings does not conduct business with TMX-Finance at arm’s length and that it receives gratuitous services from TMX-Finance, indicating that TMX-Holdings is not separate and distinct from TMX-Finance. It presented evidence, through Wall’s testimony, that a TMX-Finance employee, Linda Long, prepares annual accounting reports for TMX-Holdings, but there is no contract governing provision of this service, and TMX-Holdings does not pay her for this service. Cf. All Star Enter., Inc. v. Buchanan, 298 S.W.3d 404, 423 (Tex. App.-Houston [14th Disk] 2009, no pet.) (“Although the employees common to Antero [parent company] and Piceance [subsidiary] were paid by Antero, this is not evidence of an abnormal degree of control; the evidence instead is undisputed that Antero billed the affiliated entity for services rendered by the employees, and the affiliated entity remitted payment to Antero for such services.”); Conner, 944 S.W.2d at 419 (noting that employees for parent company “provide legal, accounting and other services” to subsidiary company, but parent company “bills [subsidiary company] for all of the legal, accounting or other services its employees provide to [the subsidiary]”).
And Wellshire presented evidence, through Wall’s testimony, that TMX-Holdings does not have any employees of its own, that it only has two officers, himself and Young, and that neither of them receives a salary from TMX-Holdings for the work that they perform as officers. Instead, Young and Wall receive paychecks solely from TMX-Finance. See I & JC Corp. v. Helen of Troy L.P., 164 S.W.3d 877, 890 (Tex. App.-El Paso 2005, pet. denied) (noting, in upholding finding that parent and subsidiary were alter egos, that president of parent company controlled daily operations of subsidiary but received paycheck only from parent, not subsidiary); see also Capital Tech. Info. Servs., 270 S.W.3d at 754 (noting, in upholding trial court’s alter-ego finding, that parent company had no employees and that payroll of parent and subsidiary companies was “the same”).
Furthermore, Wellshire presented evidence that both TMX-Holdings and TMX-Finance are incorporated in Delaware, that Delaware law requires that “[t]he business and affairs of every corporation organized *19 [under Delaware law] shall be managed by or under the direction of a board of directors,” and that TMX Holdings does not have a board of directors and does not hold board meetings. See 8 Del. Code § 141(a); id. § 211(b) (“Unless directors are elected by written consent in lieu of an annual meeting as permitted by this subsection, an annual meeting of stockholders shall be held for the election of directors on a date and at a time'designated by or in the manner provided in the bylaws.”). Wall testified that TMX-Holdings does not have a board of directors, and, although he also testified that Young is TMX-Holdings’ only director, Wellshire presented irrefutable evidence to the contrary in the form of three years’ worth of public Delaware franchise tax filings in which TMX-Holdings, through its officer Young, reported, under penalty of perjury, that it had no directors.
All of this is strong evidence that TMX-Holdings failed to follow corporate formalities that maintain its distinction from TMX-Finance.

d. The existence of separate headquarters

Finally, with respect to the sole remaining PHC-Minden factor, Wellshire presented evidence that TMX-Holdings and TMX-Finance share the same corporate headquarters in Savannah, Georgia and that TMX-Holdings does not pay any rent to TMX-Finance for use of that space. Wellshire thus argued that TMX-Holdings and TMX-Finance should be treated as a single entity for personal jurisdictional purposes.
In sum, the jurisdictional evidence clearly establishes the satisfaction of all of the PHC-Minden factors for determining that two corporation are “fused” as a single business enterprise for purposes of the exercise of personal jurisdiction over both on an alter-ego theory. It is undisputed that, in October 2012, Tracy Young, the president and CEO' of TMX-Finance, transferred his 100% membership interest in TMX-Finance to the newly-formed TMX-Holdings. Young is the president, CEO, and sole shareholder of TMX-Holdings, and thus Young indirectly owns TMX-Finance. It is also undisputed that Christopher Kelly Wall is vice president of both TMX-Holdings and TMX-Finance. Thus, both of TMX-Holdings’ officers are officers, of TMX-Finance, although Wall testified in his deposition that TMX-Finance has an additional officer who is not also an officer of TMX-Holdings. Further, it is undisputed that TMX-Holdings and TMX-Finance share headquarters in Savannah, Georgia, and Wall testified that TMX-Holdings does not pay rent for use of these facilities. See PHC-Minden, 235 S.W.3d at 175 (considering amount of subsidiary’s stock owned by parent corporation and whether entities have separate offices in jurisdictional veil-piercing analysis). And Wellshire presented evidence that TMX-Holdings had never had any directors, despite being required by Delaware law to have at least one director, does not conduct business with TMX-Finance at arm’s length, and receives gratuitous services from TMX-Finance.
There is not a single one of the PHC-Minden factors that is not satisfied in this case. Thus, under the clear mandate of the Texas Supreme Court, Wellshire met its burden of proof to demonstrate such a degree of control by TMX-Holdings over TMX-Finance that the two entities ought to be fused for jurisdictional purposes. See PHC-Minden, 235 S.W.3d at 175-76; Capital Tech. Info. Servs., 270 S.W.3d at 754-55; I & JC Corp., 164 S.W.3d at 890 (“This record shows such unity between the two corporations that the separateness of the corporations is virtually non-existent.”).
*20 I would hold that the trial court did not err by denying TMX-Holdings’ special appearance based on alter-ego theory.

C. Fair Play and Substantial Justice

Having determined that Wellshire met its burden of establishing jurisdiction over TMX-Holdings on an alter-ego theory, I would further hold that, under principles of fair play and substantial justice, Texas courts can, consistent with due process, exercise personal jmisdiction over TMX-Holdings. See Capital Tech. Info. Servs., 270 S.W.3d at 755 (“Even where the contacts of the parent are imputed to the subsidiary based on the theory of alter ego, the trial court’s exercise of general, personal jurisdiction over the subsidiary must comport with traditional notions of fair play and substantial justice.”).
In making this inquiry, courts consider (1) the burden on the defendant of litigating in Texas; (2) the interests of the forum state in adjudicating the dispute; (8) the plaintiffs interest in obtaining convenient and effective relief; (4) the interstate judicial system’s interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. Spir Star AG, 310 S.W.3d at 878; Cappuccitti, 222 S.W.3d at 486. To defeat jurisdiction, the defendant must present “a compelling case that the presence of some consideration would render jurisdiction unreasonable.” Spir Star AG, 310 S.W.3d at 878-79 (quoting Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 231 (Tex. 1991)).
The burden on TMX-Holdings of litigating this dispute in Texas is minimal. TMX-Holdings argues that this factor weighs against exercising jurisdiction “[bjecause of the distance between TMX Holdings’ office and Houston” and because TMX-Holdings’ representatives would need to travel to Texas and TMX-Holdings “would have to exchange documents and other evidence with other parties and attorneys in Texas and would have to attend the trial of the case in Texas.” Distance from the forum state alone, however, is not sufficient to defeat jurisdiction. See id. at 879.
Moreover—and very importantly— TMX-Holdings’ only officers, Young and Wall, are also officers of TMX-Finance, which has consented to jurisdiction, and Wall has been designated as the corporate representative for both entities. See Cappuccitti, 222 S.W.3d at 486 (“Minerec, Flottec, and Cappuccitti are all alter egos of each other. Cappuccitti is president of Minerec, and Minerec did not contest the personal jurisdiction of the trial court over it.”); see also Spir Star AG, 310 S.W.3d at 879 (“Three of [the parent company’s] directors collectively own seventy-five percent of [the subsidiary], which will be litigating in Houston.”).
Wall also testified in his deposition that Young, in his capacity as officer of TMX-Finance, does have reason to visit Texas on occasion, and he “visits sites and meets with the departments that are located in [this] state.” See Spir Star AG, 310 S.W.3d at 879 (considering fact that parent company’s president and directors traveled to Houston on occasion); Cappuccitti, 222 S.W.3d at 486 (same). Wellshire’s claims against TMX-Holdings “will not require great additional burdens to try” beyond the claims that are already being properly litigated in this forum.
Texas has a substantial interest in adjudicating this dispute, which involves allegations of torts committed against Texas companies and the alleged misuse of identifying information of Texas customers. See Spir Star AG, 310 S.W.3d at 879 (“Texas has a significant interest in exercising jurisdiction over controversies aris *21 ing from injuries a Texas resident sustains from products that are purposefully brought into the state and purchased by Texas companies.”); Cappuccitti, 222 S.W.3d at 487 (“Texas has a substantial interest in protecting its citizens both against harm from breach of contract and against harm from the torts alleged in this litigation.”).
Additionally, none of the other defendants in the underlying proceeding contested the exercise of personal jurisdiction over them, and, thus, the claims against these defendants are properly being litigated in Texas. It would, therefore, be more efficient to adjudicate the entire case in one forum. See Spir Star AG, 310 S.W.3d at 879 (“[Bjecause the claims against [the subsidiary] will be heard in Texas, it would be more efficient to adjudicate the entire case in the same place”). Furthermore, trying Wellshire’s suit against TMX-Holdings here in Texas, as opposed to in Georgia, where TMX-Holdings contends the case ought to be tried, “will avoid duplication of efforts and minimize the possibility of inconsistent findings on common issues.” See Cappuccitti, 222 S.W.3d at 487; see also Capital Tech. Info. Servs., 270 S.W.3d at 755 (“[T]he interstate judicial system’s interest in obtaining the most efficient resolution of the controversy will be served by litigation in Texas where most of the individuals and documents are located. [The parent corporation] has already answered the lawsuit in Texas, and piecemeal litigation would result in inefficiency.”).
Finally, the interests of the two states involved, Texas and Georgia, as the state where TMX-Holdings and TMX-Finance have their principal places of business, are best served by litigating the related claims against each of the defendants in Texas, where the alleged improper scheme to misappropriate Wellshire’s trade secrets and interfere with Wellshire’s relations with its customers and the alleged damages occurred. See Cappuccitti, 222 S.W.3d at 487.
I conclude and would hold that exercising personal jurisdiction over TMX Holdings does not offend traditional notions of fair play and substantial justice. See Spir Star AG, 310 S.W.3d at 879-80; Capital Tech. Info. Servs., 270 S.W.3d at 755-56; Cappuccitti, 222 S.W.3d at 487.
Conclusion
I would grant rehearing and affirm the order of the trial court denying TMX-Holdings’ special appearance.