**Opinion issued March 20, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-23-00865-CV**

———————————

**COSTAMARE, INC., Appellant**

**V.**

**BRANDY MAMOU, Appellee**

———

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-62053**

———

**MEMORANDUM OPINION**

Costamare, Inc. ("Costamare"), a foreign holding company, appeals the denial of its special appearance. Plaintiff-appellee Brandy Mamou, a longshoreman truck driver, alleged that he was seriously injured while driving his truck and assisting with discharging containers from the container ship *Sealand Washington*

at the Port of Houston. Although Costamare is neither incorporated in Texas, nor is Texas its principal place of business, Mamou alleged that the trial court had specific jurisdiction over Costamare as the alter ego of Christos Maritime Corporation, the owner of the ship. On appeal, Costamare argues that the trial court erred by denying its special appearance because Mamou failed to meet his burden to prove alter ego for the purpose of jurisdiction.

We agree. Mamou failed to meet his burden to establish that Costamare is the alter ego of Christos Maritime Corporation. We reverse the trial court's order denying the special appearance and render judgment dismissing Mamou's claims against Costamare, Inc.

### Background

## I.     Costamare, Costamare Shipping, and Christos

### A.     Costamare

Costamare is a holding company that has been in business for more than 50 years and is publicly traded on the New York Stock Exchange. Costamare is incorporated in the Marshall Islands, and its principal place of business is Monte Carlo, Monaco, where board meetings are held. Costamare's chief executive officer is Konstantinos Konstantakopoulos, whose father founded Costamare. Gregory Zikos is the chief financial officer and director of Costamare. Other

directors are Konstantino Zacharatos, Charlotte Stratos, and Vagn Lehd Moller. Anastasios Gabrielides serves as general counsel and secretary of Costamare.

Through its subsidiaries, Costamare provides containerships and dry bulk vessels for charter. Costamare wholly owns around 110 subsidiaries, each of which owns a single vessel.[1] Subsidiary companies pay salaries, management fees, financing costs from loans, and other expenses, and the charterers make payments directly to the subsidiaries, not to Costamare. Costamare's subsidiaries annually retain funds for upcoming liabilities and then pay the remaining profit to Costamare as dividends. When a subsidiary has a deficit, the necessary funds are provided either by a third-party loan, which may be guaranteed by Costamare, or by a capital infusion from Costamare. Costamare has no employees. Costamare shares no bank accounts with Costamare Shipping or Christos. The consolidated financial statements that Costamare files with the U.S. Securities and Exchange Commission include all Costamare's subsidiaries. In its annual reports, Costamare describes the vessels owned by its subsidiaries as its fleet.

B.    Costamare Shipping

Costamare Shipping Company S.A. ("Costamare Shipping") is a private company, incorporated in Panama, with its principal place of business in Athens, Greece. It is solely owned by Konstantinos Konstantakopoulos, who is the

_____

[1]    According to Costamare's annual reports, it also has other holdings, including companies solely or jointly with related parties or with third parties.

3

president and a director of the company. Konstantin Zacharatos and Mr. Papaioannou are also directors of Costmare Shipping. George Koutantakis is the chief financial officer.

Costamare Shipping provides management services primarily to vessels owned by Costamare's subsidiaries. Costamare and Costamare Shipping entered into a contract ("the Framework Agreement") in which Costamare promised to cause its subsidiaries to enter into individual ship management contracts with Costamare Shipping for commercial and technical management services. Commercial management services included finding customers to charter the vessels, negotiating charter contracts ("charter parties"), providing accounting and legal support, and securing insurance coverage. Technical management services included hiring crews for the vessel owner, ensuring repairs and maintenance were completed, and anything else necessary to ensure the safe operation of the vessel. Under the Framework Agreement, technical management services could be provided by Costamare Shipping or by a third-party technical manager, like V.Ships Greece, Ltd ("V.Ships").

Costamare Shipping shares no bank accounts with Costamare or Christos. In its 2021 Annual Report, Costamare explained the supervisory relationship between Costamare and Costamare Shipping:

> Our chairman and chief executive officer and our chief financial officer supervise, in conjunction with our board of directors, the

4

services provided by Costamare Shipping . . . . Costamare Shipping . . . report[s] to our board of directors through our chairman and chief executive officer and our chief financial officer, each of whom is appointed by our board of directors.

## C. Christos Maritime Corporation

Christos Maritime Corporation ("Christos") is one of Costamare's wholly-owned subsidiaries. Christos is incorporated in Liberia, and it has a mailing address "care of" its managers in Athens, Greece. Konstantinos Konstantakopoulos is the sole director, president, secretary, and treasurer of Christos. Christos owned the *Sealand Washington* until it was sold to the subsidiary of a third-party Mediterranean shipping company in February 2023.

The *Sealand Washington* was commercially managed by Costamare Shipping and technically managed by V.Ships Greece Ltd. Under the management agreement, Costamare Shipping negotiated 'charter party' contracts for Christos and handled its accounting.[2] At the time of Mamou's injury, Maersk Line A/S ("Maersk") had chartered the *Sealand Washington* under a 'time charter party' that gave Maersk the right to determine certain operating details regarding cargo and delivery, and to direct routes and schedule port calls.

Christos, not Costamare, employed the *Sealand Washington* crew. Christos shares no bank accounts with either Costamare or Costamare Shipping.

---

[2] 'Charter party' or 'charterparty' is a term of art in the shipping business referring to contracts between vessels and the charterers of those vessels.

## II.    The Incident

Mamou was a longshoreman truck driver working at the Houston Bayport Container Terminal, which is owned and operated by the Port of Houston Authority ("POHA"). On August 4, 2022, Mamou was driving his truck and assisting with discharging containers from the container ship *Sealand Washington*. As he was "driving down Lane 4 at Bayport 2, proceeding to receive another container," his truck was "struck by a spreader bar attached to crane #205," operated by a POHA employee. Mamou alleged that "[t]he spreader bar struck the cab of the truck at least twice." Mamou lost consciousness and sustained multiple, significant injuries to several parts of his body.

## III.    The Lawsuit

Mamou initially filed suit against POHA, and he later added Maersk Line, Limited, Costamare, Christos, Costamare Shipping, and V.Ships. Initially, Mamou alleged only that all defendants, including Costamare, "systematically conduct business in the State of Texas, and the cause of action giving rise to this lawsuit occurred in the State of Texas," concluding the trial court "ha[d] specific jurisdiction." In his Sixth Amended Petition, Mamou alleged that the trial court had specific jurisdiction over Costamare as the alter ego of Christos.

Costamare filed a special appearance in April 2023. At that time, Mamou's live pleading was the Third Amended Petition, filed in February 2023. Mamou had

not yet sued Christos or alleged a theory of jurisdictional alter ego. The Third Amended Petition alleged that Costamare was "a foreign entity doing business in the State of Texas." At that time, Mamou alleged that Costamare was negligent for failing to take a number of preventative safety-related actions.

Costamare's special appearance argued that Costamare was not subject to general or specific jurisdiction. Costamare argued that the trial court lacked specific jurisdiction because Mamou's claims did not arise out of "any incident, alleged negligent acts, or business activities occurring in Texas that would have been performed by Costamare." Costamare denied that it owned or operated the *Sealand Washington*. Costamare also argued that it lacked sufficient contacts to be considered 'essentially at home' in Texas.

In support of its special appearance, Costamare relied on an unsworn declaration from Anastasios Gabrielides, who had served as Costamare's general counsel since 2013. He averred that Costamare is incorporated in the Republic of the Marshall Islands and has its principal office in Monaco. He stated that Costamare has no office in Texas, does not operate in Texas, and has no agent in Texas. Gabrielides denied that Costamare has ever been incorporated in Texas, maintained any type of facility in Texas, maintained a mailing address or phone number in Texas, paid or been required to pay franchise taxes in Texas, maintained a bank account in Texas, owned or leased any real or personal property in Texas,

been licensed or authorized to do business in Texas, or had employees or agents in Texas. He also averred that when Mamou was allegedly injured, the *Sealand Washington* was owned by Christos, managed by Costamare Shipping and V.Ships, and on charter to Maersk.

In response to Costamare's special appearance, Mamou amended his petition in April 2023 and again in June and October 2023, making the Sixth Amended Petition Mamou's live pleading. Mamou added Christos, Costamare Shipping, and V.Ships as defendants. He also pleaded that the trial court had specific jurisdiction over Costamare because it was the alter ego of Christos, relying on the following evidence to support his jurisdictional argument: (1) the deposition of John Harry Webster, Costamare's corporate representative; (2) Costamare annual reports from 2021 and 2022; (3) Costamare's 2021 Form 20-F, which was filed with the United States Securities and Exchange Commission; (4) Costamare and Costamare Shipping's "Framework Agreement"; (5) his live pleading; (6) a ship management agreement between Christos Maritime and Costamare Shipping; and (7) the charter party contract in effect at the time of his injury.

Mamou likewise argued that Costamare was the beneficial owner of the *Sealand Washington* based on statements in its annual reports and the Form 20-F. In Costamare's 2021 annual report, it called itself "one of the leading owners and providers of containerships and dry bulk vessels for charter." The Form 20-F

8

stated: "We are a holding company and our subsidiaries conduct all of our operations and own all our operating assets, including our ships." The Form 20-F also stated that the consolidated financial statements were prepared "in accordance with U.S. generally accepted accounting principles," and included "the accounts of Costamare and its wholly owned subsidiaries."

Mamou also relied on the deposition of John Harry Webster, who is in-house counsel for Costamare Shipping and who was offered as the corporate representative for Costamare. Webster testified that Costamare is a holding company, and he described the structure of its business, including the numerous single-asset subsidiary companies, the Framework Agreement, and the role of Costamare Shipping. Webster testified that each Costamare subsidiary "has its own separate corporate existence, separate board, [and] its own revenue stream."

Webster explained how Costamare makes money. Costamare is the sole owner of its vessel-owning subsidiaries, including Christos. Once the company chartering the vessel pays for the use of the vessel, Costamare Shipping, as commercial manager, ensures that the money is deposited in the vessel-owning subsidiary's bank account. The subsidiary pays its obligations, including manager's fees, repairs, repayment of loans, and payroll for the crew. It may also set aside money for known, upcoming liabilities. Any remaining profit is distributed to the parent company, Costamare, as a dividend.

9

In this case, Christos generated revenue from Maersk's payments for the chartering the *Sealand Washington*. Costamare Shipping's accounting department provided bookkeeping services, tracked revenue, and ensured that the payments were deposited in Christos's account. And Christos paid its profits to Costamare as a dividend, after retaining sufficient funds for known liabilities.

After a hearing, the trial court denied the special appearance, and Costamare appealed.

## Analysis

On appeal, Costamare argues that the trial court erred by denying its special appearance because there is no evidence to support either a finding of general or specific jurisdiction over it, or a finding that it is the alter ego of Christos for the purpose of jurisdiction. Mamou maintains that the trial court has specific jurisdiction over Costamare based on the commission of a tort in Texas, beneficial ownership of the vessel, and the alter ego theory.

## I. Standard of Review

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law that we review de novo. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021); *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018).

The defendant can negate jurisdiction on a factual or legal basis, either by demonstrating factually that it has no contacts with Texas, thereby disproving the plaintiff's allegations, or by demonstrating that the plaintiff's facts, even if true, legally fail to establish jurisdiction. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010). If the defendant produces facts disproving the plaintiff's allegations, the burden then shifts back to the plaintiff to "respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction." *Id.* "When, as here, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the judgment that are supported by evidence." *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013).

## II. Personal Jurisdiction

Texas courts may exercise personal jurisdiction over a nonresident when (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal due process guarantees. *Old Republic*, 549 S.W.3d at 558. "Federal due-process requirements limit a state's power to assert personal jurisdiction over a nonresident defendant." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007). "Personal jurisdiction is proper when the nonresident defendant has established minimum

contacts with the forum state, and the exercise of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Personal jurisdiction may be general or specific. *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 592 U.S. 351, 358 (2021). A court exercising general personal jurisdiction may hear any and all claims against a nonresident defendant. *Id.* "Specific jurisdiction is different: It covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Id.* at 359. A court exercising specific personal jurisdiction may hear claims that arise out of or relate to the nonresident defendant's contacts with the forum state. *Id.* at 359–60 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017)). In the context of specific personal jurisdiction, the "minimum contacts" standard requires that (1) the nonresident defendant has *purposefully availed* itself of the privilege of conducting activities in the forum state, and (2) there exists a "*nexus* between the nonresident defendant, the litigation, and the forum." *Luciano*, 625 S.W.3d at 14 (quoting *Moki Mac*, 221 S.W.3d at 579 (emphasis added)).

A. **Purposeful Availment**

We consider three factors to determine whether a nonresident defendant has purposefully availed itself of the privilege of conducting activities in Texas:

First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Thus, sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities. Finally, the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction.

*Moncrief Oil Int'l*, 414 S.W.3d at 151 (emphasis added) (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338–39 (Tex. 2009)); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 475 (1985)). We consider all the evidence and focus on "the quality and nature of the contacts, not the quantity." *Moncrief Oil*, 414 S.W.3d at 151.

## B. Nexus

The relatedness—or nexus—component of minimum contacts requires that there be a connection between the nonresident defendant's purposeful contacts in Texas and the plaintiff's suit. *Luciano*, 625 S.W.3d at 14. However, it does not require a strict causal relationship between the defendant's in-state activity and the litigation. *Id.* at 14–15. Instead, the relatedness inquiry demands only that the suit "arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co.*, 592 U.S. at 362 ("[W]e have never framed the specific jurisdiction inquiry as always requiring proof . . . that the plaintiff's claim came about because of the defendant's in-state conduct.").

"[S]pecific jurisdiction requires us to analyze jurisdictional contacts on a claim-by-claim basis." *Moncrief Oil*, 414 S.W.3d at 150 (citing *Kelly*, 301 S.W.3d at 660). Due to the difference between general jurisdiction and specific jurisdiction, "[i]f a defendant does not have enough contacts to justify the exercise of general jurisdiction, the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts." *Id.* (citing *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274–75 (5th Cir. 2006)). "A court, however, need not address contacts on a claim-by-claim basis if all claims arise from the same forum contacts." *Id.* at 150–51.

## C.    Fair Play and Substantial Justice

"Once minimum contacts have been established, we must still consider whether, for other reasons, exercising jurisdiction over the nonresident defendant would nevertheless run afoul of 'traditional notions of fair play and substantial justice.'" *Luciano*, 625 S.W.3d at 18 (quoting *Int'l Shoe*, 326 U.S. at 316). "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 878 (Tex. 2010) (quoting *Guardian Royal Exch. Assurance, Ltd. v. Eng. China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991)). "We consider the nonresident defendant's contacts in light of (1) the burden on the defendant; (2) the interests of

the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of several states in furthering fundamental substantive social policies." *Luciano*, 625 S.W.3d at 18.

## III. Specific Jurisdiction Based on Alter Ego Status

"Texas law presumes that two separate corporations are distinct entities." *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 173 (Tex. 2007). When a plaintiff sues a parent corporation and its subsidiary, the plaintiff bears the burden to prove that the relationship between the parent and its subsidiary would allow the court to impute one entity's "doing business" in Texas to the other. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002); *see also Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983) ("Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there; the mere existence of a parent-subsidiary relationship is not sufficient to warrant the assertion of jurisdiction over the foreign parent."). "The rationale for exercising jurisdiction is that 'the parent corporation exerts such domination and control over its subsidiary 'that they do not in reality constitute separate and distinct corporate entities but are

one and the same corporation for purposes of jurisdiction.'" *PHC-Minden*, 235 S.W.3d at 173 (quoting *BMC Software*, 83 S.W.3d at 798).

Substantive veil-piercing and jurisdictional veil-piercing involve different elements of proof. *Id.* at 174. Substantive-veil-piercing factors may not be relevant to a determination of jurisdictional veil piercing, for the purpose of asserting personal jurisdiction over a nonresident defendant, because "personal jurisdiction involves due process considerations that may not be overridden by statutes or the common law." *Id. Cf. Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P.*, 417 S.W.3d 46, 85 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (discussing factors and considerations relevant to piercing corporate veil or imposing alter ego for purpose of liability). The Supreme Court has recognized that jurisdictional veil-piercing requires a greater-than-normal exercise of control over the subsidiary company:

> To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary. But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice.

*PHC-Minden*, 235 S.W.3d at 174 (quoting *BMC Software*, 83 S.W.3d at 799). That is, a court will recognize a parent corporation as the alter ego of its subsidiary corporation when the parent corporation "exerts such domination and control over

16

its subsidiary" that the corporations, in reality, are not separate and distinct but one and the same for the purpose of jurisdiction. *Id.* at 173.

Four factors that are relevant to the determination of whether a parent exercises such control that the entities should not be regarded as separate and distinct for the purpose of jurisdiction include: (1) the amount of the subsidiary's stock owned by the parent corporation; (2) the existence of separate headquarters; (3) the observance of corporate formalities; and (4) the degree of the parent's control over the general policy and administration of the subsidiary. *Id.* at 175 (citing 4A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1069.4). The first three factors relate to whether the corporate structure is conducive to excessive control, while the fourth factor relates to actual control. *TMX Fin. Holdings, Inc. v. Wellshire Fin. Servs., LLC*, 515 S.W.3d 1, 8 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd).

Evidence of common ownership, shared office space, and parental involvement typical of an investor do not prove that one company is the alter ego of another without something more—a "plus" factor "beyond the subsidiary's mere presence within the bosom of the corporate family." *PHC–Minden*, 235 S.W.3d at 176 (quoting *Dickson marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999)); *see TMX Fin. Holdings*, 515 S.W.3d at 8. "It is this plus factor that converts, for jurisdictional purposes, the typical parent-subsidiary relationship—

17

which involves common ownership, monitoring, reporting, and articulating of general policies—into an alter-ego relationship." *TMX Fin. Holdings*, 515 S.W.3d at 8. The parent's actual control over the subsidiary must be "abnormal" or "atypical." *Id.*

Abnormal or atypical control may be shown by, for example, proof of commingled funds, payment of corporate debts with personal checks of an owner or officer, an owner or officer's individual financial backing of the corporation, diversion of company profits for personal use, and inadequate capitalization. *Cappuccitti v. Gulf Indus. Prods., Inc.*, 222 S.W.3d 468, 482–84 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that Cappuccitti, his wholly-owned holding company, and its majority-owned subsidiary were alter egos for jurisdictional purposes when evidence showed commingling of funds, Cappuccitti's payment of corporate debts with his personal checks, diversion of company profits, and inadequate capitalization). Likewise, proof that two corporations share headquarters, office space, identical boards of directors, board meetings, minutes, combined financial records, websites, tax returns, expenses, and employee stock incentive plans can be evidence that the companies are so "fused" that one is the alter ego of the other. *Cap. Tech. Info. Servs., Inc. v. Arias & Arias Consultores*, 270 S.W.3d 741, 752–55 (Tex. App.—Dallas 2008, pet. denied) (holding that parent and wholly-owned subsidiary were alter egos when evidence

showed that two corporations shared headquarters building, paid each other's debts, had identical boards of directors, held singular rather than separate board meetings, took one set of minutes at said meetings, and distinction between entities was unclear even to employees).

## IV. Personal jurisdiction does not exist in this case.

### A. The court does not have general personal jurisdiction over Costamare.

In response to Costamare's special appearance, as on appeal, Mamou did not expressly argue that Costamare is subject to general jurisdiction. In his live pleading, Mamou alleged, in part, that the court had jurisdiction over the case because "all Defendants systematically conduct business in the State of Texas, and the cause of action giving rise to this lawsuit occurred in the State of Texas." To the extent this can be construed as an allegation that Costamare is subject to general jurisdiction in Texas, the evidence shows that Costamare does not systematically conduct business in Texas such that it is essentially at home in this state. *See Old Republic Nat'l Title Ins.*, 549 S.W.3d at 565 ("Even when a defendant's contacts may be continuous and systematic, they are insufficient to confer general jurisdiction if they fail to rise to the level of rendering a defendant '*essentially at home* in the forum [s]tate.'" (quoting *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 72 (Tex. 2016) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 138 (2014)))).

19

The evidence shows that Costamare is a Marshall Islands corporation with its principal office in Monaco. According to its general counsel, it has no operations, employees, agents, facilities, property, or bank accounts in Texas. Costamare's general counsel also noted that Costamare did not own the *Sealand Washington*. Based on the pleadings and evidence before the trial court, we conclude that Costamare did not have the type of substantial, continuous, and systematic contacts with Texas necessary to support a finding of general jurisdiction. *See Ford Motor Co.*, 592 U.S. at 358; *Daimler*, 571 U.S. at 137–39; *Luciano*, 625 S.W.3d at 8.

**B.     The court does not have specific personal jurisdiction over Costamare individually or as an alter ego of Christos.**

Mamou maintains that the trial court has specific jurisdiction over Costamare based on the commission of a tort in Texas, beneficial ownership of the vessel, and the alter ego theory.

**1.     Commission of a Tort**

Mamou argues on appeal that Costamare waived its special appearance by failing to negate the allegations that it committed a tort in Texas. We agree that the defendant has the burden to negate all pleaded bases of personal jurisdiction alleged by the plaintiff, but we disagree that Costamare failed to meet this burden. *See Kelly*, 301 S.W.3d at 658.

20

Mamou's live pleading alleged that Maersk "and/or [Costamare] and/or [Christos] and/or [Costamare Shipping] and/or [V.Ships] was negligent" for failing to take a number of affirmative actions to ensure the safety of the working environment while the crane with the swinging spreader bar operated. Mamou also pleaded in the alternative that Maersk "and/or [Costamare] and/or [Christos]" owned the *Sealand Washington*.

While "Texas law allows an employee's forum contacts to be imputed to the employer," the evidence showed that Costamare has no employees. *Sarjak Container Lines Singapore PTE Ltd. v. Semons*, No. 01-21-00508-CV, 2023 WL 3235939, at *12 (Tex. App.—Houston [1st Dist.] May 4, 2023, no pet.) (mem. op.). Moreover, Mamou did not allege that anyone with Costamare was present in Texas at the time of the accident, meaning his allegations that Costamare failed to take certain safety measures that would have protected him were not alleged to be acts or omissions that Costamare committed in Texas. Hence, Costamare was not required to provide evidence specifically negating that it was involved in such acts or omissions. *See id.* at *11 ("Because Semons did not assert these jurisdictional allegations in the trial court, the burden of proof never shifted to Sarjak to negate them.").

The jurisdictional evidence showed that Christos, not Costamare, owned the *Sealand Washington*. This evidence includes the 'charter party' with Maersk,

21

Gabrielides's declaration, Webster's testimony that, at the time of the incident, Costamare was not the legal owner of the *Sealand Washington*, and the Christos-Costamare Shipping ship management agreement. Gabrielides's declaration stated that the *Sealand Washington* was owned by Christos at the time of Mamou's injury, and that it was on a long-term charter to Maersk, who controlled its operations and movements. Webster's testimony established that Christos employed the crew of the *Sealand Washington* and Costamare had no employees. Mamou's allegations about the commission of a tort in Texas depend on the actions or failures to act by the crew of the *Sealand Washington*.

Mamou's reliance on statements in Costamare's annual reports that it is "one of the world's leading owners and providers of containerships" as some evidence that Costamare owned the *Sealand Washington* is misplaced. The annual reports included Costamare's SEC Forms 20-F, which made clear that when "Costamare," "Company," or similar terms were used in a historical context, they referred to Costamare and/or its subsidiaries. Webster testified that the SEC filings were consolidated, meaning the filings pertained to accounting for Costamare and its subsidiaries. The Form 20-F also makes clear that Costamare does not own any ships: "We are a holding company and our subsidiaries conduct all of our operations and own all of our operating assets, including our ships. We have no significant assets other than the equity interests in our subsidiaries." Thus, the

22

annual reports do not support a finding that Costamare owned the *Sealand Washington*.

The jurisdictional evidence negates Costamare's alleged ownership of the vessel and conclusively proves that it did not employ the crew. Accordingly, we conclude that Costamare's alleged commission of a tort in Texas is not a basis for the court to exercise specific personal jurisdiction.

## 2. Beneficial Ownership

Mamou argues that beneficial ownership is a basis for the trial court to exercise specific jurisdiction over Costamare. Beneficial ownership is the idea that shareholders are the equitable or beneficial owners of the corporate assets because "when the corporation is dissolved and its creditors are satisfied, they hold title to the assets in proportion to their respective shares." *Sneed v. Webre*, 465 S.W.3d 169, 191 (Tex. 2015) (quoting *Aransas Pass Harbor Co. v. Manning*, 94 Tex. 558, 63 S.W. 627, 629 (1901)).

Mamou relies on *FIMBANK PLC v. Discover Investment Corp.*, No. 2:19-CV-00264, 2020 WL 3519159, at *10 (S.D. Tex. May 21, 2020), report and recommendation adopted, No. 2:19-CV-264, 2020 WL 3504179 (S.D. Tex. June 29, 2020), to support this argument, but his reliance is misplaced because *FIMBANK* involves the admiralty-attachment context governed by the supplemental admiralty rules of federal court, where *quasi in rem* jurisdiction of a

23

ship and the plausibility of alter-ego-liability allegations were at issue, not the court's personal jurisdiction over the alleged beneficial owner. *See id.* at \*8.

Mamou argues "beneficial ownership" as way to disregard the corporate form. But as we have explained, a different analysis is required when a plaintiff seeks to disregard the corporate form in order to establish specific personal jurisdiction. *See PHC-Minden*, 235 S.W.3d at 174. As we have explained, while a company can act through its employees, Costamare has no employees, and there is no evidence in the appellate record that Costamare, in its role as equitable or beneficial owner, influenced or directed the *Sealand Washington*'s August 2022 trip to Texas. *See Johnson v. Kindred*, 285 S.W.3d 895, 904 (Tex. App.—Dallas 2009, no pet.) (rejecting defendant's beneficial ownership in trust as basis for specific jurisdiction when defendant did not influence or direct the trustee's purchase of Texas property). Accordingly, we reject "beneficial ownership" as a grounds for specific jurisdiction.

### 3. Alter Ego

Finally, Mamou alleged that Costamare is the alter ego of Christos. "When a plaintiff asserts jurisdiction over a nonresident defendant under an alter-ego theory, the plaintiff has the burden to overcome the presumption of separateness by proving its alter-ego allegation." *TMX Fin. Holdings*, 515 S.W.3d at 8 (citing *BMC Software*, 83 S.W.3d at 798). Mamou alleged that Christos was "a mere tool or

24

business conduit" of Costamare, and that "there is such unity" between Costamare and Christos that "the separateness of the corporations has ceased." Mamou asserted that Costamare was the alter ego of Christos and beneficial owner of the *Sealand Washington* and its liability derives from the activities of the vessel's crew on that date of the incident.[3] Mamou pleaded:

> Because Defendant Costamare, Inc. is the alter ego of Defendant Christos Maritime Corporation, Defendant Costamare, Inc. was the beneficial owner of the *Sealand Washington* on August 4, 2022 when the vessel was docked at the Port of Houston. Because the alleged misconduct of Defendant Costamare, Inc. arises from the activities of the crew of the vessel when it was present in Texas, the Court has specific jurisdiction over Defendant Costamare, Inc.

On appeal, Mamou argues that there was ample evidence to support a conclusion that Costamare was the alter ego of Christos. Specifically, Mamou argues that Costamare stripped Christos of "any of the hallmarks of independence to equip or man its vessel, set a budget for its vessel, operate its vessel, choose its customers, or otherwise make a single decision or hold a single dollar." Thus, Mamou argues, Costamare is the alter ego of Christos for the purpose of jurisdiction and such a finding avoids "the fraud or injustice Costamare's scheme would work" on Mamou. Costamare argues on appeal that Mamou failed to prove that it exercised abnormal or atypical control over Christos as necessary to prove

---

[3] Because this is an interlocutory appeal involving only Costamare's special appearance and the record is limited, we do not know whether Christos has challenged the trial court's assertion of personal jurisdiction.

25

alter ego. We agree with Costamare that Mamou failed to demonstrate that it exercised the type of atypical control needed to support an alter ego finding for jurisdictional purposes.

As noted above, we consider four factors relevant to the jurisdictional alter ego inquiry: (1) the amount of the subsidiary's stock owned by the parent corporation; (2) the existence of separate headquarters; (3) the observance of corporate formalities; and (4) the degree of the parent's control over the general policy and administration of the subsidiary. *See PHC-Minden* at 175. First, Costamare owns 100% of Christos's stock. This is some evidence that the corporate structure is conducive to excessive control, but it is not evidence of actual control. *See TMX Fin. Holdings*, 515 S.W.3d at 8. Second, Costamare and Christos have separate headquarters. Costamare's headquarters are in Monaco, while Christos's principal office is in Athens, Greece, where its corporate managers reside. This factor does not support a conclusion of excessive control. *See id.*

Third, the evidence proves that Costamare and Christos observe corporate formalities. For example, Webster testified that Costamare Shipping, which is not owned by Costamare, provided commercial management services to Christos pursuant to a contract. While the contract between Costamare and Costamare Shipping provided that Costmare would cause its ship-owning subsidiaries, such as

Christos, to enter into standard management contracts with Costamare Shipping, the contract does not provide that Costamare would have control over those management decisions. While Christos employed the ship's crew, Costamare Shipping was responsible for providing services for Christos, including arranging insurance and locating potential customers, like Maersk, who would charter the *Sealand Washington*. And V.Ships, not Costamare, provided Christos with technical management of the *Sealand Washington*, including safety management and making necessary repairs to ship.

Webster testified that Christos's accounts are kept separate from those of Costamare; Christos pays its own expenses; and income does not simply pass through to Costamare. Rather, Christos pays Costamare a dividend after retaining any money needed to cover anticipated short-term and long-term liabilities. Christos also does not share any employees with Costamare because Costamare has no employees.

While Webster testified that Costamare can provide a capital infusion to its subsidiaries, when necessary, there is no evidence that Costamare did provide Christos with an infusion of capital or that Costamare paid any of Christos's debts directly. Costamare's 2021 annual report stated that in 2020 Christos was one of five subsidiaries to enter into a $70 million credit facility with a bank. That loan was guaranteed by Costamare and secured by first priority mortgages over the

vessels, account pledges, general assignments of earnings, insurances, requisition compensation, and charter rights. In other words, the loan was taken in accordance with typical business formalities. *See Wilmington Tr., Nat'l Ass'n v. Hsin-Chi-Su*, 573 S.W.3d 845, 857–58 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (holding that debt guarantee by owner of 100% of corporation's stock was not proof that owner was alter ego of corporation).

Costamare held its own board meetings in Monaco, and its board of directors provided supervision over Costamare Shipping and third-party vessel managers, who, in turn, provided services to Christos in accordance with written management agreements. Costamare included all its subsidiaries in its annual report to its investors, but Costamare is a publicly traded corporation, and its assets are relevant to its shareholders. *See BMC Software*, 83 S.W.3d at 799–800 ("BMCS's referencing its subsidiaries in its annual report is a common business practice, which the Internal Revenue Service, the SEC, and generally accepted accounting principles recommend."). This factor does not support a conclusion that Costamare exercised abnormal or atypical control over Christos.

The fourth factor is the degree of the parent's control over the general policy and administration of the subsidiary. The evidence showed that Costamare supervised Costamare Shipping, which provided "certain general administrative services to [Christos]," many upon Costamare's request. Costamare Shipping

28

prepared the budget for Christos, which was subject to approval by Costamare. However, Costamare did not directly exercise control over the administration of Christos nor did Costamare have any contracts with Christos.[4] The appellate record does not demonstrate that Costamare exercised any direct control over the selection of charterers, Christos's crew on the *Sealand Washington*, or the ship's routes. V.Ships, as the technical manager for the vessel, was responsible for safety management, compliance with laws and regulations, and "coordinating with the crew."

Rather than the Costamare board of directors exercising control over Christos, Konstantinos Konstantakopoulos individually served as the sole director, president, secretary, and treasurer of Christos. And while he also served as the CEO of Costamare and the sole owner and president of Costamare Shipping, common ownership and parental involvement that is typical of an investor's involvement does not support a conclusion that a parent is the alter ego of the

---

[4]     The contract between Costamare and Costamare Shipping provided that Costamare Shipping was required to comply with the reasonable policies, guidelines, and instructions of Costamare's subsidiaries, including Christos. The contract also provided that Costamare's subsidiaries would set corporate policies independently through their boards of directors. Costamare Shipping provided commercial management services for Christos, many upon Christos's request. Costamare Shipping provided chartering services, which included seeking and negotiating with potential charterers, like Maersk, "in accordance with [Christos's] instructions," and obtaining Christos's written consent for charter agreements exceeding 36 months. Costamare Shipping was required to report major casualties to Christos, establish accounting systems that meet Christos's requirements, and supervise any sale of the vessel in accordance with Christos's instructions.

subsidiary. *PHC–Minden*, 235 S.W.3d at 176; *see TMX Fin. Holdings*, 515 S.W.3d at 8.

Mamou did not offer pleadings or evidence to support the existence of a "plus factor" demonstrating that Costamare and Christos have become so fused that they are no longer separate and distinct corporate entities. *See PHC–Minden*, 235 S.W.3d at 173; *TMX Fin. Holdings*, 515 S.W.3d at 8. In the absence of this plus factor, we conclude that Mamou did not carry his burden to prove that Costamare is the alter ego of Christos. *See BMC Software*, 83 S.W.3d at 798 (noting law presumes separate corporations are indeed separate and places burden of proving alter ego on the party alleging it). Accordingly, we hold that the trial court did not have specific personal jurisdiction over Costamare.

\* \* \* \*

Having held that the trial court did not have either general or specific personal jurisdiction over Costamare, we sustain Costamare's sole issue, and we hold that the trial court erred by denying Costamare's special appearance.

## Conclusion

We reverse the trial court's order and render judgment granting the special appearance and dismissing for want of jurisdiction all of Mamou's claims against Costamare.


Susanna Dokupil
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.